## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

SECURITY TITLE GUARANTEE
CORPORATION OF BALTIMORE,

       Plaintiff,

    v.

915 DECATUR ST NW, LLC,

       Defendant.

Civil Action No. 18-1128 (CKK)

## AMENDED MEMORANDUM OPINION
(originally posted December 11, 2019; amended as of March 23, 2020)

Plaintiff The Security Title Guarantee Corporation of Baltimore ("Security Title") and Defendant 915 Decatur St. NW LLC ("Decatur") dispute whether, under a title insurance policy, Security Title must defend Decatur in a separate lawsuit brought against Decatur and other defendants in the District of Columbia Superior Court. The parties further dispute whether Security Title must indemnify Decatur for any losses stemming from that lawsuit. Pending before the Court are the parties' renewed cross-motions for summary judgment. *See* 915 Decatur St. NW LLC's Renewed Mot. for Summ. J. ("Decatur's Renewed Summ. J. Mot."), ECF No. 22; Pl.'s Renewed Cross-Mot. for Summ. J. and Opp'n to Def.'s Mot. for Summ. J. ("Security Title's Combined Renewed Cross-Mot. and Opp'n"), ECF No. 23.

In broad strokes, Decatur argues that the policy provisions governing Security Title's obligation to defend cover the underlying case. Security Title disagrees. It contends that the underlying litigation does not trigger its duty to defend for two reasons. First, it argues that the lawsuit does not qualify as a covered risk under the policy because the policy has a provision limiting coverage to only certain claims. The claims at issue here are not covered because Decatur has transferred its interest in the property and because the underlying losses did not occur while

1

Decatur owned the property. Second, Security Title argues that the claims in the underlying lawsuit do not fall within the policy's coverage and/or are excluded under certain conditions in the relevant policy excepting matters created or agreed to by Decatur. Both parties' indemnification arguments hinge upon their above arguments regarding whether the underlying litigation is covered under the relevant title insurance policy.

Upon consideration of the briefing,[1] the relevant legal authorities, and the record as a whole, the Court **GRANTS IN PART** and **DENIES WITHOUT PREJUDICE IN PART** Security Title's motion for summary judgment and **DENIES IN PART** and **DENIES WITHOUT PREJUDICE IN PART** Decatur's motion for summary judgment. In light of these rulings, the Court **DENIES AS MOOT** Decatur's Motion to Expedite. *See* Def. 915 Decatur St. NW LLC's Mot. to Expedite Ruling, ECF No. 28.

---

[1] The Court's consideration has focused on the following documents:
- Def. 915 Decatur St. NW LLC's Mot. for Summ. J. ("Decatur's First Summ. J. Mot."), ECF No. 9;
- Mem. of P. & A. in Supp. of Pl.'s Cross-Mot. for Summ. J. and Opp'n to Def.'s Mot. for Summ. J. ("Security Title's First Combined Cross-Summ. J. Mot. and Opp'n"), ECF No. 11–1;
- 915 Decatur St. NW LLC's Reply to Security Title's Resp. and Resp. to Security Title's Cross-Mot. for Summ. J. ("Decatur's First Combined Opp'n and Reply"), ECF No. 13;
- Reply in Supp. of Security Title's Mot. for Summ. J. ("Security Title's First Reply"), ECF No. 15;
- Suppl. to Mot. for Summ. J. ("Decatur's Suppl."), ECF No. 16;
- Decatur's Renewed Summ. J. Mot., ECF No. 22;
- Mem. of P. & A. in Supp. of Security Title's Combined Renewed Cross-Mot. and Opp'n ("Security Title's Mem. in Supp. of Combined Renewed Cross-Mot. and Opp'n"), ECF No. 23–1;
- 915 Decatur St. NW LLC's Resp. to Security Title's Renewed Mot. for Summ. J. and Reply to Opp'n to 915 Decatur's Renewed Mot. for Summ. J. ("Decatur's Combined Opp'n and Reply"), ECF No. 25; and
- Reply in Supp. of Pl.'s Mot. for Summ. J. ("Security Title's Second Reply"), ECF No. 27.
In an exercise of its discretion, the Court finds that holding oral argument for these motions would not be of assistance in rendering a decision. *See* LCvR 7(f).

# I. BACKGROUND

For purposes of summary judgment briefing, Security Title does not dispute Decatur's identification of certain facts underlying this case. Security Title's First Combined Cross-Summ. J. Mot. and Opp'n at 2; *see* Security Title's Mem. in Supp. of Combined Renewed Cross-Mot. and Opp'n at 2 (incorporating prior summary judgment briefing's statement of facts). In its original summary judgment briefing, which Security Title has incorporated into its renewed motion, Security Title simply discounts those facts' materiality to the pending motions, and supplies additional documents, including the insurance policy at issue. Security Title's First Combined Cross-Summ. J. Mot. and Opp'n at 2 at 2–3. Decatur does not object to those additional documents.

Moreover, in its renewed motion, Security Title identifies a few additional facts, all of which relate to allegations in the amended complaint in the underlying litigation. Security Title's Mem. in Supp. of Combined Renewed Cross-Mot. and Opp'n at 2–3. While Decatur objects to the underlying allegations, it does not dispute that these allegations are in the amended complaint in the underlying suit. Decatur's Combined Opp'n and Reply at 2–3.

The facts relevant to the present decision are quite few. Decatur's managing member, Frank Olaitan, toured and eventually purchased real property at 2022 1st Street, NW, Washington, DC from "a woman whom he believed to be Ms. Bridget Fordham." Decatur's First Summ. J. Mot. ¶¶ 4–6, 8–12.[2] Although Ms. Fordham was not present at the closing, a deed transferring the property was purportedly signed by Ms. Fordham and notarized as of the date of the deed, December 7, 2016. *Id.* ¶¶ 12, 15; *id.* Ex. A ("December 7 Deed"). The deed was recorded on

---

[2] When the Court cites to specific paragraphs in Decatur's First Motion for Summary Judgment, it is citing specifically to paragraphs in the section entitled "Statement of Material Facts."

December 15, 2016 at 12:37 PM with the District of Columbia's Recorder of Deeds. *Id.* ¶ 14; *id.* Ex. A at 2. Upon concluding the December 7, 2016 purchase, Decatur sold the property to Claremont Management, LLC ("Claremont"), on December 8, 2016. *Id.* ¶ 13; *id.* Ex. B ("December 8 Deed"). That deed dated December 8, 2016 was also recorded on December 15, 2016, two minutes after the first deed at 12:39 PM. *Id.* ¶ 14; *id.* Ex. B.

Separately, Decatur entered into a title insurance policy with Security Title to cover the property. *See* Security Title's First Combined Cross-Summ. J. Mot. and Opp'n Ex. 2 ("Title Insurance Policy" or "Policy"), ECF No. 11-3. The Policy lists the "Date of Settlement" as December 7, 2016, and the "Date of Policy" as December 15, 2016. *Id.* at 7.

Then, in October 2017, Ms. Fordham filed suit against Decatur, Mr. Olaitan, Claremont, and others in the Superior Court for the District of Columbia. Decatur's First Summ. J. Mot. ¶ 18; *id.* Ex. F (Ms. Fordham's original complaint). Ms. Fordham alleged that her signature on the deed was forged and that the conveyance to Decatur, and consequently the conveyance to Claremont, were fraudulent. *Id.* ¶¶ 18–21; *see generally id.* Ex. F. Security Title later declined Decatur's request for legal defense in Ms. Fordham's lawsuit. *Id.* ¶¶ 34–36; *see id.* Ex. I (April 26, 2018 Letter from Security Title). Decatur and Security Title then filed separate lawsuits seeking declaratory judgments that Decatur was and was not, respectively, entitled to legal defense against Ms. Fordham under the Policy. *See id.* ¶¶ 37–39. At this time, both suits are pending before this Court. *See 915 Decatur St NW, LLC v. Sec. Title Guarantee Corp. of Baltimore, Inc.*, No. 18-cv-1569 (D.D.C.) (Kollar-Kotelly, J.) (other case related to present matter). Ms. Fordham later amended her complaint to include, among other things, a count for negligence. *See* Decatur's Suppl. Ex. 1 ("Fordham's Am. Compl.").

After Decatur and Security Title first moved for summary judgment in this case, the Court denied their motions without prejudice for two reasons. *See* November 15, 2018 Order, ECF No. 20. First, there had been developments in the underlying D.C. Superior Court case, including the filing of Ms. Fordham's Amended Complaint with new claims. *Id.* at 1. Second, the Court required additional briefing from the parties on a specific issue relating to the parties' dispute over whether Decatur's transfer of interest in the property meant that the Policy's coverage no longer applied. *See id.* at 2–3. The Court now considers the parties' additional briefing and renewed cross-motions for summary judgment.

## II. LEGAL STANDARD

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In ruling on cross-motions for summary judgment, a court shall grant summary judgment only if one of the moving parties is entitled to judgment as a matter of law upon material facts that are not genuinely disputed. *See Rhoads v. McFerran*, 517 F.2d 66, 67 (2d Cir. 1975); *Long v. Gaines*, 167 F. Supp. 2d 75, 84 (D.D.C. 2001). The mere existence of some factual dispute is insufficient on its own to bar summary judgment; the dispute must pertain to a "material" fact. Fed. R. Civ. P. 56(a). Accordingly, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Nor may summary judgment be avoided based on just any disagreement as to the relevant facts; the dispute must be "genuine," meaning that there must be sufficient admissible evidence for a reasonable trier of fact to find for the non-movant. *Id.*

In order to establish that a fact is or cannot be genuinely disputed, a party must (A) cite to specific parts of the record—including deposition testimony, documentary evidence, affidavits or

declarations, or other competent evidence—in support of its position, or (B) demonstrate that the materials relied upon by the opposing party do not actually establish the absence or presence of a genuine dispute. Fed. R. Civ. P. 56(c)(1). Conclusory assertions offered without any factual basis in the record cannot create a genuine dispute sufficient to survive summary judgment. *See Ass'n of Flight Attendants-CWA, AFL-CIO v. U.S. Dep't of Transp.*, 564 F.3d 462, 465–66 (D.C. Cir. 2009). Moreover, where "a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact," the district court may "consider the fact undisputed for purposes of the motion." Fed. R. Civ. P. 56(e).

When faced with a motion for summary judgment, the district court may not make credibility determinations or weigh the evidence; instead, the evidence must be analyzed in the light most favorable to the non-movant, with all justifiable inferences drawn in her favor. *Liberty Lobby*, 477 U.S. at 255. If material facts are genuinely in dispute, or undisputed facts are susceptible to divergent yet justifiable inferences, summary judgment is inappropriate. *Moore v. Hartman*, 571 F.3d 62, 66 (D.C. Cir. 2009). In the end, the district court's task is to determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Liberty Lobby*, 477 U.S. at 251–52. In this regard, the non-movant must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Liberty Lobby*, 477 U.S. at 249–50 (internal citations omitted).

# III. DISCUSSION

The Title Insurance Policy at issue has a specific provision governing when and whether Security Title must provide a defense to Decatur. Section 5 of the Conditions portion of the Policy provides:

> Upon written request by the Insured, and subject to the options contained in Section 7 of these Conditions, the Company, at its own cost and without unreasonable delay, shall provide for the defense of an Insured *in litigation in which any third party asserts a claim covered by this policy* adverse to the Insured. This obligation is limited to *only those stated causes of action alleging matters insured against by this policy*. The Company shall have the right to select counsel of its choice (subject to the right of the Insured to object for reasonable cause) to represent the Insured *as to those stated causes of action*. It shall not be liable for and will not pay the fees of any other counsel. The Company will not pay any fees, costs, or expenses incurred by the Insured *in the defense of those causes of action that allege matters not insured against by this policy*.

Title Insurance Policy at 4 (emphases added). The Policy specifies that Security Title only has a duty to defend when the claims in the litigation are covered by the Policy. To determine whether the underlying claims brought by Ms. Fordham triggered Security Title's duty to defend Decatur, then, the Court must consider whether the claims she has brought are, or would be, covered risks. The Policy covers numerous risks, but the parties here focus on one principal area of coverage. The Covered Risks portion of the Policy explains that:

> [Security Title] insures as of Date of Policy and, [in limited circumstances], after Date of Policy, against loss or damage, not exceeding the Amount of Insurance, sustained or incurred by the Insured by reason of: . . .
>> Any defect in or lien or encumbrance on the Title. This Covered Risk includes but is not limited to insurance against loss from
>>> (a) A defect in the Title caused by
>>>> (i) forgery, fraud, undue influence, duress, incompetency, incapacity, or impersonation[.]

*Id.* at 1. In other words, certain defects in the title are covered by the Policy, and this includes title defects due to forgery or fraud. *Id.* However, the Policy also furnishes a long list of exclusions from coverage in a separate portion. Chief among those exclusions are "[d]efects, liens,

encumbrances, adverse claims, or other matters" that were "created, suffered, assumed or agreed to" by Decatur. *Id.* at 2.

The parties also included in the Policy a temporal limitation on coverage. Section 2 of the Conditions limits the coverage period to while Decatur has an estate or interest in the property:

> The coverage of this policy shall continue in force as of Date of Policy in favor of an Insured, but only so long as the Insured retains an estate or interest in the Land, or holds an obligation secured by a purchase money Mortgage given by a purchaser from the Insured, or only so long as the insured shall have liability by reason of warranties in any transfer or conveyance of the Title. This policy shall not continue in force in favor of any purchaser from the Insured of either (i) an estate or interest in the Land, or (ii) an obligation secured by a purchase money Mortgage given to the Insured.

*Id.* at 4. In short, coverage under the Policy only continues so long as Decatur has an interest in the property, has an obligation secured by a purchase money mortgage, or has an obligation due to warranties in any future transfer of Decatur's interest. However, the Policy imposes no temporal restriction on when Decatur must file claims. *See id.*

Based on these provisions, the parties now dispute whether the claims in the underlying litigation are covered under the Policy. Security Title first argues that Decatur's transfer of its interest to Claremont signaled the end of coverage under the Policy. It further contends that all of the claims in the underlying litigation fall into the exception for defects or other matters created or agreed to by Decatur. Decatur disagrees on both points; it claims that the relevant losses related to the underlying claims occurred during the coverage period, that a special warranty in the deed to Claremont extended the coverage period, and that the exclusion is inapplicable here, especially with respect to the negligence claim in Ms. Fordham's amended complaint. Decatur also moves for summary judgment on the basis that Security Title breached the covenant of good faith and fair dealing.

This Opinion first discusses the applicable District of Columbia insurance contract principles before addressing the parties' arguments with respect to the Policy's temporal and substantive scopes. Because the Court grants summary judgment on the duty to defend issue to Security Title based on the temporal and substantive scope of the Policy, and therefore finds that Security Title did not breach the Policy by refusing to defend Decatur, it does not address Decatur's breach of good faith and fair dealing argument.[3] Lastly, the Opinion addresses the parties' arguments with respect to Security Title's duty to indemnify.

A. Applicable Insurance Contract Principles

"Because an insurance policy constitutes a contract," it is construed "according to contract principles." *Stevens v. United Gen. Title Ins. Co.*, 801 A.2d 61, 66 (D.C. 2002). "Where insurance contract language is not ambiguous, summary judgment is appropriate because a written contract duly signed and executed speaks for itself and binds the parties without the necessity of extrinsic evidence." *Id.* (internal quotation marks and alterations omitted) (quoting *Travelers Indem. Co. of Ill. v. United Food & Commercial Workers Int'l Union*, 770 A.2d 978, 985 (D.C. 2001)). Generally, contract terms are interpreted "in a manner consistent with ordinary speech." *Id.*

In the context of the duty to defend in title insurance contracts, District of Columbia law adheres to the "eight corners" rule, which means that "[t]his [C]ourt must look to whether the allegations included in the complaint state a cause of action within the policy's coverage, and whether the allegations raise the possibility of coverage." *Am. Cont'l Ins. Co. v. Pooya*, 666 A.2d 1193, 1197 (D.C. 1995); *see Stevens*, 801 A.2d at 66 ("To make this determination, our long

---

[3] Nor does it address Decatur's seeming request for attorneys' fees and punitive damages relating to this action, *see, e.g.*, Decatur's Renewed Summ. J. Mot. at 4; Decatur's Combined Opp'n and Reply at 8, especially as Decatur did not file a cross-claim in this matter and the original Complaint primarily sought a declaratory judgment, *see* Compl., ECF No. 1, at 6.

standing case law requires us to examine both the complaint and the insurance policy."). "As a general principle, the focus 'must always be on the allegations of the complaint.'" *Pooya*, 666 A.2d at 1198 (quoting *Washington v. State Farm Fire & Cas. Co.*, 629 A.2d 24, 26 n.5 (D.C. 1993)). Consequently, courts must "examine the complaint for all plausible claims encompassed within the complaint" in order "to ascertain whether the allegations of the complaint state a cause of action within the policy coverage." *Id.* at 1197.

At bottom, if the complaint's allegations state a claim covered by the policy, "the insurance company must defend." *Id.* at 1198 (internal quotation marks omitted) (quoting *S. Freedman & Sons, Inc. v. Hartford Fire Ins. Co.*, 396 A.2d 195, 197 (D.C. 1978)). "[T]he obligation to defend 'is not affected by facts ascertained before suit or developed in the process of litigation or by the ultimate outcome of the suit.'" *Id.* (quoting *Washington*, 629 A.2d at 26). Still, "the duty to defend is broader and more extensive than the duty to indemnify." *Stevens*, 801 A.2d at 67. "Any doubt as to whether there is a duty to defend must be resolved in favor of the insured," and "[t]he insurer has the burden of proving the applicability of a policy exclusion." *Id.* at 67 & n.6.

That said, it is worth noting that this case raises questions of interpretation that have rarely been addressed by other courts, especially in the District of Columbia. For instance, cases that have considered similar continuation of coverage clauses with potentially analogous facts have done so in cases involving the duty to indemnify, not just the duty to defend. *See, e.g.*, *Chicago Title Ins. Co. v. 100 Inv. Ltd. P'ship*, 355 F.3d 759 (4th Cir. 2004); *Centennial Dev. Grp., LLC v. Lawyer's Title Ins. Corp.*, 310 P.3d 23 (Ariz. Ct. App. 2013). In those cases, because the insured party was seeking coverage for already-suffered losses or damages, it may have been easier to determine whether those losses or damages were covered by the Policy. In the duty to defend context, however, this Court must follow the "eight corners" rule and can consider only "the facts

as alleged to be" in the underlying litigation's operative complaint. *Travelers Indem.*, 770 A.2d at 987 (internal quotation marks omitted) (quoting *S. Freedman & Sons*, 396 A.2d at 197).

This complicates certain determinations. For example, rather than determine if an already-suffered loss or damage occurred during the coverage period, the Court must ascertain whether a loss or damage based on the underlying litigation's claims—if successful—would have occurred during the Policy's coverage period. There is little, if any, District of Columbia law on the intersection of these insurance contract interpretation questions. This Court, "mindful that a federal court should normally decline to speculate on a question of local doctrine," therefore applies the above-outlined District of Columbia contract interpretation principles to such questions. *Nationwide Mut. Ins. Co. v. Richardson*, 270 F.3d 948, 950 (D.C. Cir. 2001) (internal quotation marks and alterations omitted) (quoting *East v. Graphic Arts Indus. Joint Pension Tr.*, 107 F.3d 911, 911 (D.C. Cir. 1997)), *certified question answered*, 826 A.2d 310 (D.C. 2003), *reh'g en banc granted*, *opinion vacated*, 832 A.2d 752 (D.C. 2003), *and vacated pursuant to settlement*, 844 A.2d 344 (D.C. 2004).

B. The Effect of Decatur's Transfer of Its Interest in the Property

The parties' first dispute relates to whether the underlying litigation falls within the coverage period. As explained above, the Policy provides that coverage continued "only so long as" Decatur retained an interest in the property, held an obligation secured by a purchase money mortgage, or will be liable due to warranties in the transfer or conveyance of the title. Title Insurance Policy at 4. Security Title contends that as Decatur transferred its interest in the property on December 8, 2016 to Claremont, its coverage has ended, and Security Title has no obligation to defend. Decatur argues that even if it did transfer its interest, case law in other jurisdictions supports that if the loss or damage occurred during the coverage period, as it argues is the situation

here, the claims may still be covered. Moreover, Decatur claims that a special warranty in the deed to Claremont extended the coverage period. The Court considers each of these arguments in turn.

*1. Decatur's Transfer of Interest*

The Policy specifies that coverage continues only so long as Decatur maintained an interest in the property at issue. Decatur, however, transferred its interest in the property to Claremont on December 8, 2016. Security Title asserts that as a result of this transfer, Decatur no longer has coverage and therefore Security Title has no obligation to defend it in the underlying suit.

The Court agrees that, unless one of the exceptions applied, Decatur's transfer of its interest in the property means that its coverage effectively ended when it transferred away its interest in the property. The Policy's plain language "evinces the intent of the parties to limit the scope of title protection to the period running from the effective date of the policy until the insured conveys away its interest in the land, unless, in the conveyance, the insured gives warranties to the grantee." *100 Inv.*, 355 F.3d at 763. This allocation of risk makes sense, as it "gives title insurance coverage to the insured during the period when the insured purportedly owns the property," which is "when most of the adverse consequences due to a defective title would occur." *Id.* Under the Policy's language, if some "preexisting defect in title were to remain after the insured conveyed the land," that defect and the associated risk "would pass to the purchaser and [Decatur] would no longer have risk, nor coverage." *Id.* Other courts that have interpreted nearly identical contract language have found much the same. *See, e.g., id.* at 763–64; *see also Hovannisian v. First Am. Title Ins. Co.*, 221 Cal. Rptr. 3d 883, 893 (Cal. Ct. App. 2017); *Back Creek Partners, LLC v. First Am. Title Ins. Co.*, 75 A.3d 394, 399 (Md. Ct. App. 2013); *Keys v. Chicago Title Ins. Co.*, No. 3:11-CV-617-

CWR-FKB, 2012 WL 4510471, at *3 (S.D. Miss. Sept. 28, 2012); *M & I Marshall & Isley Bank v. Wright*, No. CV-10-01657-PHX-FJM, 2011 WL 181292, at *3 (D. Ariz. Jan. 19, 2011).

*2. Loss or Harm that Occurred While Decatur Owned the Property*

But it does not necessarily follow that Security Title has no obligation to defend Decatur in the underlying litigation. Decatur argues that this Court should follow the example set by other courts that have found an insured party can bring a suit with similar continuation of coverage clauses after the coverage period has ended *if* those claims are premised on loss or damage incurred *during* the coverage period. Because the Policy requires Security Title to defend Decatur in any suit covered by the Policy, adopting this approach would mean that if the underlying claims would result in such losses or damages, Security Title would be obligated to defend Decatur under the Policy in any such suits.

Both parties rely upon *Chicago Title Insurance Co. v. 100 Investment Ltd. Partnership*, 355 F.3d 759 (4th Cir. 2004), a seminal case in which the Fourth Circuit considered a similar continuation of coverage clause under Maryland law. After the insured, 100 Investment, sold the tract at issue, it discovered a competing conveyance through which a third party claimed to have owned the property. *Id.* at 761–62. 100 Investment bought the property from the other party in an attempt to "clean up" title. *Id.* at 762. The third-party owner then brought suit against 100 Investment for trespass during the period that 100 Investment purportedly owned the tract. *Id.* 100 Investment made a claim on its insurance policy for the funds to purchase the property and claiming that Chicago Title had an obligation to defend 100 Investment in the trespass suit. *Id.*

As to the first claim, the Fourth Circuit found that coverage ended when 100 Investment transferred its interest in the property. *Id.* at 762–64. 100 Investment had transferred its interest in the property with only a special warranty, not a general warranty that would have allowed

coverage to continue. *Id.* at 764. As a result, "[a]t the point of conveyance to [the purchaser], any preexisting defect in title became [the purchaser's] problem, and [the purchaser] would have to obtain its own title insurance to protect itself from any problem that might be caused by that defect." *Id.* The actions that 100 Investment took to "clean up" the title were therefore not covered under the policy. *Id.*

However, the Fourth Circuit came to a different conclusion for the second claim relating to the trespass suit. *Id.* at 765–66. 100 Investment contended that although the claim was made after the coverage terminated, "the *claim occurred* before that date," which it argued meant that the loss or damage in the underlying litigation would have been a covered risk and therefore Chicago Title was obligated to defend 100 Investment pursuant to the policy. *Id.* at 765. The Court agreed with 100 Investment. As the trespass litigation "was a dispute over title to the [tract] while 100 Investment was still the purported owner of the tract, the policy cover[ed] the loss or damage." *Id.* Moreover, the court found that there was "no language in the policy identifying it as a 'claims-made' policy, covering an insured only for claims that are asserted during the policy period." *Id.* at 766. Because the policy at issue covered all losses or damages during the policy period, and the loss or damage alleged in the underlying litigation occurred during that period, Chicago Title had an obligation to defend 100 Investment. *Id.*

Other courts have followed the example set in *100 Investment*. In *Centennial Development Group, LLC v. Lawyer's Title Insurance Corp.*, 310 P.3d 23 (Ariz. Ct. App. 2013), for example, the Arizona Court of Appeals examined and adopted this approach. In examining a similar continuation of coverage clause, the court explained that "[u]nless the insured remains subject to liability under a warranty deed, coverage does not continue in force for damages incurred from defects discovered after the insured conveys the property." *Id.* at 28. However, when the insured

"own[s] the property at the time it allegedly incurred the loss," such damages claims are "not barred by the 'continuation in force' provision of the policy." *Id.* As the insured's theory in *Centennial* was that it paid too much for the property due to an unknown easement and that the losses were "sustained when it discovered the defect in title, at a time when it owned all 75 acres," it had sufficiently shown that it incurred damages while it owned the property under Arizona law. *Id.* at 27–28. So too have other courts found that suits alleging losses or damages incurred while the insured owned the property are covered under similar policies. *See, e.g.*, *Keys*, 2012 WL 4510471, at *7 ("Based on the foregoing, an insured may bring an action against a title insurance company based on a claim made during the term of the title insurance policy, even if at the commencement of the lawsuit, the title insurance policy has already terminated as to the insured."); *M & I Marshall & Isley Bank*, 2011 WL 181292, at *3 ("When the coverage period ends pursuant to Section 2(b) of the Conditions and Stipulations, coverage may still exist for damages sustained during the coverage period, even if a claim is submitted after the coverage period.").

The District of Columbia has seemingly not examined this exact issue. However, the contract interpretation principles applied in *100 Investment* and *Centennial* mirror those applied by the District of Columbia in title insurance disputes. The continuation of coverage clauses in these other cases also closely resemble the relevant provision in this case. Accordingly, the Court finds the approach used in these cases persuasive and applies it here. If Decatur can demonstrate that the claims in the underlying lawsuit would result in losses or damages incurred by Decatur *during* the time that Decatur owned the property, the continuation of coverage clause would not bar those claims or, as a result, Security Title's obligation to defend Decatur for those claims.

The Court therefore considers whether each of the claims in the underlying litigation would result in losses or damages that were effectively incurred during the coverage period when Decatur

owned the property. Note that even if the claims fall within the coverage period, they must still be covered risks, which the Court analyzes in more detail in Section III.C.

Ms. Fordham's Amended Complaint, ECF No. 16-1, includes nine nominal counts. Two of those counts—Count Two and Count Four—relate to the relief requested (to set aside the allegedly fraudulent deed, quiet title, issue declaratory relief, and issue injunctive relief) and do not appear to state separate causes of action. Fordham's Am. Compl. ¶¶ 50–53, 57. The Court therefore examines the substance of the other seven counts and considers Count Two and Count Four in the context of the other counts.

Count One is styled "trespass to title" and alleges that the defendants, including Decatur, engaged in a fraudulent scheme to deprive Ms. Fordham of her property. Fordham's Am. Compl. ¶¶ 38–49. In particular, she alleges that Decatur and Mr. Olaitan "intentionally created a false deed and forged Plaintiff's signature on the deed." *Id.* ¶ 40. She also alleges that Decatur and Mr. Olaitan "agreed, explicitly or tacitly, to participate with other Defendants in the" fraudulent scheme. *Id.* ¶ 46. The acts alleged all occurred before Decatur owned the property and are in fact related to Decatur's gaining ownership of the property. Decatur claims that the loss or damage occurred during the coverage period because "[t]he fraud occurred at the point of sale and continued when Decatur was deceived" while owning the property. Decatur's Combined Opp'n and Reply at 4. "The criminal misrepresentation and concealment, which left Decatur a victim, continued through the Claremont conveyance," according to Decatur. *Id.* at 6.

Decatur's arguments miss the mark in two respects. First, Decatur fails to explain or support how the cause of action would have been incurred during the coverage period if a fraud occurred before Decatur took title to the property (or while it was gaining title to the property). Second, and more importantly, Decatur looks outside the Amended Complaint and puts forth its

own theory of how it was defrauded. This overlooks the "eight corners" rule that this Court must follow, as it departs from the facts pleaded in the underlying complaint. Ms. Fordham does not plead that Decatur was defrauded in this Count; she instead claims that Decatur was explicitly or implicitly involved in a scheme to defraud her. Fordham's Am. Compl. ¶¶ 40, 46.

The "trespass to title" claim and related fraudulent scheme as alleged in Ms. Fordham's Count One did not give rise to losses or damages during the coverage period. This is distinguishable from cases finding otherwise and upon which Decatur relies. For example, the date of the "claimed injury" in this Count—the trespass to title via fraudulent scheme—alleged by Ms. Fordham occurred before December 7 to December 8, when Decatur owned the property,[4] unlike in *100 Investment* when the trespass claim related to 100 Investment's alleged trespass *during* its ownership. *100 Investment*, 355 F.3d at 765–66; *see also Centennial*, 310 P.3d at 28 (explaining that *100 Investment* court "held the insurer was obligated to defend because the alleged trespass occurred during the time the insured owned the [property]").

It would be easy to think that the trespass claim in *100 Investment* and Ms. Fordham's Count One claim styled "trespass to title" in this case are analogous based on their names, but they are not. While District of Columbia courts do not appear to style claims as trespasses to title, other jurisdictions do, and these claims are essentially synonymous with quiet title actions, which seek to remove a cloud from a property's title. *See, e.g.*, *Porter v. JP Morgan Chase Bank, N.A.*, No. CIV.A. H-13-1948, 2014 WL 5466579, at *6 (S.D. Tex. Aug. 27, 2014) ("A suit to clear or quiet title—also known as suit to remove cloud from title—relies on the invalidity of the defendant's claim to the property."), *report and recommendation adopted*, No. CIV.A. H-13-1948, 2014 WL

---

[4] The parties have not explained how these dates square with the Policy's listed effective date of December 15, 2016. Title Insurance Policy at 7. Because neither party has raised the issue, however, the Court will not address it here.

5468056 (S.D. Tex. Oct. 28, 2014). Moreover, the substance of the allegations demonstrates that Ms. Fordham is alleging what essentially amounts to a fraudulent transfer, and not an actual trespass to her property during the period of 100 Investment's ownership. *See* Fordham's Am. Compl. ¶¶ 38–49. This is distinguishable from the plain trespass action in *100 Investment*. *See Back Creek Partners*, 75 A.3d at 400 n.7 (distinguishing between trespass action in *100 Investment* and claim for "costs incurred after conveying the property to clear a defect in the title of the property itself"). In fact, the trespass to title suit more closely resembles the first claim in *100 Investment* regarding clearing the title, as that appears to be the purpose of Ms. Fordham's Count One claims in light of her requested relief in Count Two. *See id.* Consequently, the claim in Count One and the related relief requested in Count Two do not fall within the coverage period.

Next is Count Three, which Ms. Fordham has styled as "trespass for mesne profits." Fordham's Am. Compl. ¶¶ 54–56. Essentially, she claims that the defendants, including Decatur, "have reaped a monetary benefit from transactions involving the Property." *Id.* ¶ 54. Unlike the trespass to title claim, this claim stems from losses or damages that would have effectively been incurred while Decatur owned the property. In particular, it would include the sale of the property to Claremont. The continuation of coverage provision therefore does not bar the claim in Count Three. However, as is outlined below in Section III.C, this claim is not covered by the policy on other grounds and therefore Security Title has no duty to defend based on this claim.

Count Five alleges a claim for unconscionability. *Id.* ¶¶ 58–61. She brings this Count against "All Defendants Claiming an Interest in the Property," which may or may not include Decatur. Assuming for purposes of these motions that it does, according to Ms. Fordham, Decatur and the other defendants "obtained title to Plaintiff's home under procedurally unconscionable circumstances" and "[t]he terms of the transaction were substantively unconscionable,

unreasonably favorable to Defendants, and varied grossly from the market rate to the detriment of Plaintiff." *Id.* ¶¶ 58–59. She claims that Mr. Olaitan and Decatur "acted with evil motive to deprive Plaintiff of her Property" and that she did not receive funds from the fraudulent transaction. *Id.* ¶¶ 60–61. Like with the trespass to title claim, the events underlying this claim—and therefore the related losses or damages—as to Decatur occurred before, not during, Decatur's ownership of the property. This claim is consequently not covered under the Policy.

The same is true of Count Six and Count Eight. Count Six alleges negligence against all the defendants. *Id.* ¶¶ 62–79. It specifically alleges that Decatur, in purchasing the property, "failed to exercise the normal standard of care in ensuring that the transaction was not the result of forgery and fraud." *Id.* ¶ 71. Count Eight alleges fraud against Decatur and several other defendants. *Id.* ¶¶ 84–92. The actions alleged in these two Counts, and the corresponding losses or damages, occurred before Decatur owned the property. The claims are therefore not covered by the Policy pursuant to the continuation of coverage clause.

However, Count Seven alleges conversion against Mr. Olaitan, Decatur, and Claremont. *Id.* ¶¶ 80–83. To the extent that Count Seven alleges that Decatur converted Ms. Fordham's property while in possession of the property, those actions and the corresponding losses fell within the coverage period. But even though Count Seven falls within the coverage period, it alleges a claim that is not covered by the Policy, as it is not a claim specifically regarding a defect in or encumbrance on the title and because it falls within one of the Policy's exclusions. The Court explores this in more detail in Section III.C below.

At bottom, Count Three and Count Seven appear to fall within the coverage period under the persuasive reasoning in *100 Investment* and other cases. But, as explained in more detail below, they either do not fall within the Policy's coverage or fall into one of the Policy's exclusions. As

the other counts in Ms. Fordham's Amended Complaint, as pled, are not premised on losses or damages that were incurred during Decatur's ownership, the continuation of coverage clause would bar recovery for those claims. Security Title accordingly has no duty to defend those claims in the underlying litigation.

### 3. The Special Warranty in the Deed to Claremont

Decatur advances one more argument under the continuation of coverage clause. In short, based on the continuation of coverage clause's language that the coverage continues "only so long as the Insured shall have liability by reason of warranties in any transfer or conveyance of the Title," Title Insurance Policy at 4, Decatur argues that the warranty in the deed to Claremont extended the coverage period, *see* Decatur's Combined Opp'n and Reply at 4–6. Decatur is mistaken.

It is true that some warranties may extend the coverage period under this language, but those warranties must make Decatur liable for covered risks. For instance, the Fourth Circuit in *100 Investment* explained why a special warranty did not extend the coverage period in the context of a nearly identical continuation of coverage clause. Under Maryland law, the deed transferring 100 Investment's interest in the property had a special warranty: It read that "Grantor covenants that it will warrant specially the property hereby granted and conveyed." 355 F.3d at 761, 763. A special warranty, created by using the term specially, equaled a "promis[e] only that 100 Investment had not itself created any defect in title." *Id.* at 764. Breach of that "special warranty [was] not be covered under the coverage extension, as the policy excluded" any defects attaching or created subsequent to when the policy went into effect. *Id.* at 764 & n.2.

The same reasoning applies here. Section 42-605 of the District of Columbia Code explains how to determine whether a warranty is a special warranty:

> A covenant by a grantor in a deed conveying real estate, "that he *will warrant specially the property hereby conveyed*," or a grant of real estate in which the granting words are followed by the words "with special warranty," shall have the same effect as if the grantor had covenanted that he, his heirs, devisees, and personal representatives will forever warrant and defend the said property unto the grantee, his heirs, devisees, personal representatives, and assigns against the claims and demands of the grantor and all persons claiming or to claim by, through, or under him.

D.C. Code § 42-605 (emphasis added). The December 8 Deed to Claremont included the following warranty: "AND the said party of the first part [Decatur] covenants that *it will warrant specially the property hereby conveyed*; and that it will execute such further assurances of said land as may be requisite." Decatur's First Summ. J. Mot. Ex. B (emphasis added). The deed's language mirrors exactly the language provided by the statute. The deed therefore created a special warranty under District of Columbia law. Consequently, the warranty in the December 8 Deed only warranted against "the claims and demands of the grantor and all persons claiming or to claim by, through, or under [Decatur]." D.C. Code § 42-605. Such claims are not covered under the Policy, which specifically excludes any "[d]efects, liens, encumbrances, adverse claims, or other matters . . . attaching or created subsequent to Date of Policy [December 15, 2016]." Title Insurance Policy at 2–3. Because what Decatur warrantied is not covered by the Policy, that warranty cannot extend the coverage period under the continuation of coverage provision. This argument therefore fails.

C. Whether the Underlying Claims Are Covered or Excluded Under the Policy

The parties also dispute whether the underlying litigation alleges claims that are covered by the Policy or specifically excluded under its conditions. The Policy insures "against loss or damage" for "[a]ny defect in or lien or encumbrance on the Title." Title Insurance Policy at 1. This extends to "[a] defect in the Title caused by (i) forgery, fraud, undue influence, duress, incompetency, incapacity, or impersonation." *Id.* The Policy, however, has specific exclusions,

including for any "[d]efects, liens, encumbrances, adverse claims, or other matters" that were "created, suffered, assumed, or agreed to by the Insured Claimant." *Id.* at 2. The Court shall consider whether each underlying claim is covered by the substantive scope of the policy and whether any fall into the Policy exclusion relied upon by Security Title.

First is Ms. Fordham's claim underlying Count One, which is for "trespass to title." Fordham's Am. Compl. ¶¶ 38–49. Count Two requests the relief of setting aside the deed, quieting title, and declaratory relief. *Id.* ¶¶ 50–53. As explained above, these two counts taken together are best understood as an action seeking to essentially quiet title for the property at issue. Ms. Fordham specifically alleges that Decatur and Mr. Olaitan "intentionally created a false deed and forged [her] signature on the deed." *Id.* ¶ 40. She further alleges that each defendant, including Decatur, "agreed, explicitly or tacitly, to participate with other Defendants in" the allegedly fraudulent acts and that their acts "aided the other Defendants and was in furtherance of a common scheme to wrongfully divest Plaintiff of title to her home for Defendants' financial profit." *Id.* ¶¶ 46–47. Because this claim is about what is essentially an alleged title defect due to forgery, it might be covered within the initial substantive scope of the policy. *See* Title Insurance Policy at 1.

But the Court need not determine whether it is covered as, upon examination of the Complaint under the eight corners rule, this claim falls within the exclusion for defects "created" or "agreed to" by Decatur. An illustrative case considering a nearly identical exclusion provision is *Stevens v. United General Title Insurance Co.*, 801 A.2d 61 (D.C. 2002). In *Stevens*, the District of Columbia Court of Appeals explained that the language "created . . . by the insured claimant" in policies such as this one has generally "been defined to reflect conscious and deliberate or intentional conduct." *Id.* at 69. The complaint in *Stevens* alleged fraudulent conduct, and because

the allegations "clearly specif[ied] intentional, conscious, and deliberate conduct by" Stevens, the court could not look beyond the four corners of the complaint at extrinsic evidence. *Id.* at 69–70. As the claim alleging a fraudulent conveyance fell within the policy's exclusions for defects or matters created by the insured, the insurance company had no obligation to defend Stevens. *Id.*

So too here. Count One of the Complaint alleges that Decatur specifically created the defect at issue by playing a role in the fraudulent conveyance. The allegations squarely fall within the policy's exclusion for defects or matters created by Decatur. *See Fogg v. Fid. Nat. Title Ins. Co.*, 89 A.3d 510, 515–16 (D.C. 2014) (finding that claim alleging that insured knew of defect was not covered for duty to defend purposes under identical exclusion provision). Decatur provides no explanation as to why Ms. Fordham's allegations themselves do not fall under this exclusion. *See, e.g.*, Decatur's First Combined Opp'n and Reply at 2–4 (arguing that claim is covered without addressing exclusion argument); Decatur's Renewed Summ. J. Mot. at 2 (contending that "[t]he plain language of the policy covers for fraud" without addressing exclusion Security Title's exclusion arguments).

Instead, Decatur repeatedly urges this Court to consider its arguments and evidence indicating that someone other than Decatur committed the alleged fraud. *See, e.g.*, Decatur's First Summ. J. Mot. at 14 ("Given the facts and reasoning outlined in Defendant's first argument above, a solid case can be made that Decatur did not participate in any acts of forgery of the deed."); *id.* at 14–15 (arguing that Security Title "failed to establish that the deed is a forgery"); Decatur's First Combined Opp'n and Reply at 3 ("Fraud occurred in this case—the question is who committed the fraud."); *id.* at 4 ("As Decatur was defrauded, Decatur is covered by the insurance policy."). In so doing, Decatur ignores the affirmation in *Stevens* and other cases of the District of Columbia's eight corners rule. Under this rule, the Court can consider only the four corners of

the Complaint plus the four corners of the Title Insurance Policy. *See Stevens*, 801 A.2d at 69–70. "[A]ny facts outside of these documents 'are irrelevant.'" *Navigators Ins. Co. v. Baylor & Jackson, PLLC*, 888 F. Supp. 2d 55, 61 (D.D.C. 2012) (quoting *Am. Registry of Pathology v. Ohio Cas. Ins. Co.*, 461 F. Supp. 2d 61, 66 (D.D.C. 2006)). The District of Columbia Court of Appeals has in fact explicitly rejected the fact-based approach that Decatur advocates for here. *See Stevens*, 801 A.2d at 70–71; *Fogg*, 89 A.3d at 516. Accordingly, the Court does not consider these arguments offered by Decatur.

Second is Ms. Fordham's claim in Count Three for trespass for mesne profits. *See* Fordham's Am. Compl. at ¶¶ 54–56. In this Count, Ms. Fordham alleges that Decatur made "a false claim of ownership" and therefore "reaped a monetary benefit from transactions involving the Property." *Id.* ¶ 54. It is unclear whether this claim would qualify for coverage under the Policy, as it does not appear to directly relate to a defect in or encumbrance on the title. But like with the trespass to title claim, the Court need not decide whether it would be covered under the Policy, as it falls under the exception for defects or matters created or agreed to by Decatur.

Third, Ms. Fordham alleges unconscionability in Count Five. *Id.* ¶¶ 58–61. In particular, she alleges that the defendants, including Decatur, "obtained title to [her] home under procedurally unconscionable circumstances." *Id.* ¶ 58. Moreover, she alleges that Decatur and Mr. Olaitan "acted with an evil motive to deprive Plaintiff of her Property, in willful disregard for her land ownership rights and such conduct was outrageous and grossly fraudulent." *Id.* ¶ 60. This claim does not fall within the Policy's coverage; it does not allege a defect in or encumbrance on the title or property itself. Moreover, even if it was covered, it would also qualify for the exclusion for defects or matters created by Decatur pursuant to Ms. Fordham's allegations.

Ms. Fordham next alleges negligence. *Id.* ¶¶ 62–79. As to Decatur, she alleges that it "failed to exercise the normal standard of care in ensuring that the transaction was not the result of forgery or fraud" while "purchasing Plaintiff's Property." *Id.* ¶ 71. She further alleged that Decatur was the proximate cause of her damages and that, if Decatur had applied the proper standard of care, "closing would not have occurred and Plaintiff would not have suffered damages." *Id.* ¶¶ 72–73. It is unclear whether this claim is covered by the Policy's terms or falls into the exclusion for defects or other matters created by Decatur.

To begin with, the claim does not directly allege a defect in or encumbrance on the title, but does mention the "forgery or fraud" that Ms. Fordham claims created a defect in the title. *See id.* ¶¶ 71–73. Moreover, courts have previously found that claims for mere negligence are not encompassed by the created or agreed to exclusions in title insurance policies. *See, e.g.*, *Am. Sav. & Loan Ass'n v. Lawyers Title Ins. Corp.*, 793 F.2d 780, 784 (6th Cir. 1986) ("The term 'created' has generally been construed to require a conscious, deliberate and sometimes affirmative act intended to bring about the conflicting claim, in contrast to mere inadvertence or negligence."); *Resolution Tr. Corp. v. Ford Mall Assocs. Ltd. P'ship*, 819 F. Supp. 826, 840 (D. Minn. 1991) ("Accident or innocent conduct, or even negligence, does not fall within the meaning of the exclusionary clause."); *Stevens*, 801 A.2d at 69 (finding that conduct in Complaint fell into exclusion because it did not "show mere inadvertence or negligence").

This case presents distinguishable circumstances, as Ms. Fordham alleges—separate from any of her claims—that "915 Decatur St NW LLC and Claremont Management, LLC are not bona fide purchasers for value, as they purported to acquire the Property for less than its appraised value, had knowledge of the scheme, and were put on notice of fraudulent activity . . . ." Fordham's Am. Compl. ¶ 32. This allegation, along with the other claims in the Complaint alleging intentional

conduct on Decatur's part, may bring the negligence claim within the Policy's coverage. Regardless of this uncertainty, the Court need not reach either issue because it found above that the losses or damages incurred for this claim occurred outside of the coverage period and that Decatur had transferred its interest in the property. *See* Section III.B.

Fifth is Ms. Fordham's conversion claim. *See* Fordham's Am. Compl. ¶¶ 80–83. This claim alleges that Decatur, Mr. Olaitan, and Claremont converted Plaintiff's personal property at the property. *See id.* This claim is not clearly incurred "by reason of" a defect in or encumbrance on the title. Even if it were so incurred, it would fall within the exclusion for claims or matters created by Decatur, as it alleges intentional conduct to convert Ms. Fordham's personal property on the part of Decatur. *See id.*

Lastly, Ms. Fordham alleges fraud in Count Eight of the Amended Complaint. *Id.* ¶¶ 84–92. Ms. Fordham claims that Decatur and Mr. Olaitan, along with others, "participated in a fraudulent scheme to deprive Plaintiff of her Property." *Id.* ¶ 84. She specifically alleges that "[e]ach Defendant named above was aware of the fraud, and benefitted from the fraud." *Id.* ¶ 92. While this claim may fall within the Policy's coverage, as it relates to the fraudulent transfer, it also certainly falls within the exclusion for defects or matters created or agreed to by Decatur.

In sum, the Court finds that Security Title does not have a duty to defend any of the claims in the underlying litigation. Each of Ms. Fordham's claims either falls outside the substantive scope of the Policy, falls into one of the Policy's exclusions, or is not covered due to the Policy's continuation of coverage clause. Accordingly, the Court grants Security Title's cross-motion for summary judgment with respect to the duty to defend, and denies Decatur's motion on the same grounds.

<u>D. Duty to Indemnify</u>

Although their summary judgment briefing focuses on the broader duty to defend, both Decatur and Security Title also request summary judgment on the issue of whether Security Title must indemnify Decatur for any liability stemming from the underlying lawsuit. The duty to defend is distinct from the duty to indemnify. *Stevens*, 801 A.2d at 67. While "the duty to defend depends only upon the facts as alleged," the duty to indemnify "is determined by the facts as ultimately proven in the case." *Gaines v. Turner Constr. Co.*, No. CV 03-2484 (PLF), 2006 WL 8449134, at *5 (D.D.C. Feb. 27, 2006); *see Hartford Fire Ins. Co. v. InterDigital Commc'ns Corp.*, 464 F. Supp. 2d 375, 378 (D. Del. 2006) ("The duty to indemnify is based on actual[] liability, while the duty to defend is based upon the allegations of the complaint.").

"As a general matter, courts refrain from adjudicating whether an insurer has a duty to indemnify the insured until after the insured is found liable for damages in the underlying action." *Hartford Fire Ins. Co.*, 464 F. Supp. 2d 378–79 (collecting cases from both within and outside the Third Circuit); *see also, e.g.*, *The Cincinnati Ins. Co. v. Berkshire Refrigerated Warehousing, LLC*, 149 F. Supp. 3d 867, 873–74 (N.D. Ill. 2015) ("In general, a determination of an insurer's duty to indemnify must follow a determination of the insured's underlying liability."); *Northland Cas. Co. v. HBE Corp.*, 160 F. Supp. 2d 1348, 1360 (M.D. Fla. 2001) ("Because an insurer's duty to indemnify is dependent on the outcome of a case, any declaration as to the duty to indemnify is premature unless there has been a resolution of the underlying claim."). This is especially true when the parties seek a declaratory judgment, as the parties do here, as that raises distinct ripeness concerns. *See, e.g.*, 28 U.S.C. § 2201 (requiring "actual controversy" under Declaratory Judgment Act); *Lake Carriers' Ass'n v. MacMullan*, 406 U.S. 498, 506 (1972) (describing ripeness test in declaratory judgment context).

Some jurisdictions, however, have found that where a court decides that the insurer has no duty to defend, the court can further decide that the insurer has no duty to indemnify. This generally occurs when the insurer has sufficiently demonstrated that it faces absolutely no liability from the underlying litigation because none of the claims will result in a covered loss. *See, e.g.*, *The Cincinnati Ins. Co.*, 149 F. Supp. 3d at 873 ("But where an insurer seeks a declaration that it has no duty to defend and no duty to indemnify, the claim regarding its duty to indemnify is not premature because its issues overlap with whether it has a duty to defend."); *Compass Ins. Co. v. City of Littleton*, 984 P.2d 606, 621 (Colo. 1999) ("However, once an insurer has prevailed on the duty to defend, the issue of the duty to indemnify is ripe for resolution because '[w]here there is no duty to defend, it follows that there can be no duty to indemnify.'" (quoting *Constitution Assocs. v. New Hampshire Ins. Co.*, 930 P.2d 556, 563 (Colo. 1996))).

That is not the situation here. Neither party has sufficiently demonstrated that there is no genuine dispute of material fact regarding whether the underlying litigation's resolution may result in a covered loss. While the facts as alleged in the Complaint are such that Security Title has no duty to defend the suit, it is less clear that it will, under no circumstances, have no duty to indemnify any losses. Considering that the underlying litigation has not yet been resolved, summary judgment is currently unwarranted as to this issue. *Cf. Reno v. Catholic Soc. Servs., Inc.*, 509 U.S. 43, 57 (1993) ("Injunctive and declaratory judgment remedies . . . are discretionary, and courts traditionally have been reluctant to apply them to administrative determinations unless these arise in the context of a controversy 'ripe' for judicial resolution." (internal quotation marks and alterations omitted) (quoting *Abbott Laboratories v. Gardner*, 387 U.S. 136, 148 (1967))).

Accordingly, this Court finds that it would be "premature and inappropriate" to decide at this juncture whether Security Title must indemnify Decatur for any liability stemming from the

underlying litigation. *Salus Corp. v. Cont'l Cas. Co.*, 478 A.2d 1067, 1071 (D.C. 1984) ("Therefore, prior to proof of any alleged wrongdoing by Salus and without any judgment by a court upon the complaints against Salus seeking punitive damages, it was premature and inappropriate for the trial court here to make a pronouncement based upon the mere prayer for punitive damages that the appellee-insurers, as a matter of public policy, were relieved from indemnifying Salus for any punitive damage awards arising out of the law suits."); *see also, e.g.*, *Nationwide Ins. v. Zavalis*, 52 F.3d 689, 693 & n.5 (7th Cir. 1995) (finding that where possibility exists that insured may be liable, "the prudent thing for the court to do is to refrain from comment on the duty to indemnify"); *Landpen Co., L.P. v. Maryland Cas. Co.*, No. 03 CIV. 3624RJHHBP, 2005 WL 356809, at *9–*10 (S.D.N.Y. Feb. 15, 2005) (explaining that "courts considering the question on actions for declaratory relief have generally declined to rule on the issue of indemnity until resolution of the underlying liability claim" and doing the same); *Cincinnati Ins. Companies v. Pestco, Inc.*, 374 F. Supp. 2d 451, 464 (W.D. Pa. 2004) ("As a general rule, a court entertaining a declaratory judgment action in an insurance coverage case should refrain from determining the insurer's duty to indemnify until the insured is found liable for damages in the underlying action."); *Hartford Cas. Ins. Co. v. Chase Title, Inc.*, 247 F. Supp. 2d 779, 780 & n.1 (D. Md. 2003) ("It would be premature to determine whether [the insurer] has a duty to indemnify until after the issues in the underlying class action have been resolved."). The Court therefore denies without prejudice Decatur's and Security Title's motions with respect to the duty to indemnify.

## IV. CONCLUSION

For the foregoing reasons, the Court **GRANTS IN PART** and **DENIES WITHOUT PREJUDICE IN PART** Security Title's Renewed Cross-Motion for Summary Judgment and Opposition to Defendant's Motion for Summary Judgment, ECF No. 23. The Court further

**DENIES IN PART** and **DENIES WITHOUT PREJUDICE IN PART** Decatur's Renewed Motion for Summary Judgment, ECF No. 22.

In particular, the Court grants Security Title's Motion with respect to the duty to defend and finds that Security Title has no duty to defend Decatur in the underlying lawsuit. However, the Court denies both parties' motions without prejudice insofar as they ask for summary judgment regarding Security Title's duty to indemnify. Any such judgment would be premature. The parties may move for summary judgment on this issue after the underlying litigation has concluded as outlined in the accompanying Order.

In light of these rulings, the Court **DENIES AS MOOT** Decatur's Motion to Expedite, ECF No. 28.

An appropriate Order accompanies this Memorandum Opinion.


Date:   December 11, 2019
Amended as of: March 23, 2020                    _____/s/_____
                                                 **COLLEEN KOLLAR-KOTELLY**
                                                 United States District Judge